IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PATRICIA ANN EBY-MANESCU, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| | : | NO. 20-4472 |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI,[1] | : | |
| Acting Commissioner of Social Security | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                            October 7, 2022

This action was brought pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"), which denied the application of Patricia Ann Eby-Manescu ("Eby-Manescu") for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 301, *et seq.* (the "Act"). Presently before the Court is Plaintiff's Brief and Statement of Issues in Support of Request for Review ("Pl. Br.") (Doc. 13); Defendant's Response to Plaintiff's Request for Review ("Def. Br.") (Doc. 14); Plaintiff's Reply Brief ("Pl. Reply") (Doc. 17); and the record of the proceedings before the Administrative Law Judge ("ALJ") (Doc. 12) (hereinafter "R.").[2] Plaintiff asks the Court to reverse the decision of the ALJ and to remand the matter to the Commissioner for an award of

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew Saul as Defendant. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] The Administrative Record was initially uploaded to ECF at Doc. 9 but was found to contain an incomplete transcript of the hearing. *See* Doc. 12 (Supplemental Certification). The Commissioner then uploaded a complete record at Doc. 12. It is that compilation of the record to which we cite with our "R." citations.

disability or for further administrative proceedings. The Commissioner seeks the entry of an order affirming the decision of the ALJ. For the reasons set forth below, we grant the request for review and remand for further proceedings.

## I. FACTUAL AND PROCEDURAL HISTORY

Eby-Manescu filed a claim for DIB on June 4, 2018, alleging disability beginning on May 17, 2018, at which time she was 57 years old. She had prior work history as a secretary and an appointment clerk. (R. 17, 28.) She stopped working due to ongoing back problems following surgery she underwent in 2016. She reported that her pain was not alleviated by any of the treatment modalities she tried, including ablations, epidural injections, physical therapy, and chiropractic care. (R. 22.) She described pain in the cervical spine area that shot up to her head, in addition to lumbar spine pain that radiated into her legs. (R. 22-23.) She also described peripheral neuropathy and frequent falls, which led to a prescription for a walker that she used outside of the home, along with a quad cane for use in her home. She discontinued all of her prior activities outside of her home, where she lives with her husband and two adult children, who together do the shopping and most of the driving. (R. 23.)

The state agency denied her claim on August 15, 2018, and Eby-Manescu requested a hearing with an ALJ. Her counsel obtained and submitted to the ALJ updated records of her medical treatments since the state agency review. Counsel also obtained questionnaire responses and letter updates from her physiatrist, Brian Goldberg, M.D., and her primary care provider, Natalie Rice, M.D. The ALJ convened a hearing on January 23, 2020, at which Eby-Manescu appeared with counsel and testified. An impartial vocational expert ("VE") also testified regarding the vocational implications of various functional capacity formulations propounded by the ALJ in hypothetical questions, as well as to the functional requirements of jobs that Eby-Manescu held in

the past. The VE testified that if either of the opinions offered by the treating physiatrist or primary care physician were fully credited, there would be no jobs that Eby-Manescu could perform.

On February 12, 2020, the ALJ issued her written decision. She found that Eby-Manescu had not been disabled at any time since May 17, 2018 (her alleged disability onset) based on her finding that Eby-Manescu could perform her past relevant work. Eby-Manescu requested review by the Appeals Council, but on March 20, 2020, that body determined that there was no reason to set aside the ALJ's decision, rendering it the final decision of the Commissioner. This litigation followed.

## II.     STANDARD OF REVIEW

This Court must determine whether the ALJ's conclusion that Eby-Manescu could perform her past relevant work is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Rutherford v. Barnhart*, 399 F. 3d 546, 552 (3d Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). *See also Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003). Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of evidence." *Rutherford*, 399 F.3d at 552. The factual findings of the Commissioner must be accepted as conclusive, provided they are supported by substantial evidence. *Richardson*, 402 U.S. at 390 (citing 42 U.S.C § 405(g); *Rutherford*, 39 F.3d at 552). The review of legal questions presented by the Commissioner's decision, however, is plenary. *Shaudeck v. Commissioner of Social Security Admin.*, 181 F.3d 429, 431 (3d Cir. 1999).

## III.    DECISION UNDER REVIEW

The issue before the ALJ at the time of the February 12, 2020 decision under review was whether Eby-Manescu had been disabled within the meaning of the Act at any time since May 17,

3

2018. The ALJ undertook the sequential evaluation process set forth in 20 C.F.R. § 404.1520(a) to reach her conclusion. At Step One, she found that Eby-Manescu had not engaged in substantial gainful activity since the alleged onset date. (R. 19, Finding No. 2.) At Step Two, she found that Eby-Manescu suffered from severe, medically determinable impairments, specifically superficial vein thrombosis; "degenerative disc disease, residuals of lumbar discectomy"; and "degenerative joint disease, residuals of total knee replacement." (R. 19, Finding No. 3.) At Step Three, she concluded that Eby-Manescu did not have an impairment or combination of impairments that satisfied the criteria of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926). (R. 16, Finding No. 4.) This listing finding is not in dispute.

The ALJ then considered Eby-Manescu's residual functional capacity ("RFC"), which is defined as "the most [a claimant] can do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ determined:

> **5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except occasionally climb ramps or stairs. Never climb ladders, ropes, or scaffolds. Occasionally stoop, crouch, and kneel but never crawl. Only frequent handling, fingering, and feeling with the bilateral upper extremities. Limited to jobs that could be performed while using an assistive device for prolonged ambulation or uneven surfaces.**

(R. 22.)

At Step Four, the ALJ concluded that Eby-Manescu was capable of performing past relevant work as a secretary and appointment clerk, which she found did not require the performance of work-related activities precluded by the RFC described above. (R. 28, Finding No. 6.) With this finding, the ALJ did not need to proceed to Step Five but rather could conclude that Eby-Manescu had not been under a disability. (R. 29, Finding No. 7.)

IV.   DISCUSSION

Plaintiff raises three challenges to the ALJ's decision.  First, she contends that the ALJ committed legal error when she failed to recognize Eby-Manescu's migraines to be a severe impairment, which caused her to overestimate Eby-Manescu's RFC later in the evaluation process.  (Pl. Br. at 4-7.)  Second, she asserts that the ALJ reached an RFC finding that is the product of legal error in that she did not properly evaluate the medical opinions offered by two treating medical sources.  (Pl. Br. at 8-15.)  Finally, she asserts that when making the Step Four finding, the ALJ failed to properly consider the demands of her past relevant work and that the finding that she could perform past work was thus not supported by substantial evidence.  (Pl. Br. at 15-19.)

We begin with the first issue presented by Plaintiff.  As we set forth below, that analysis provides a sufficient basis for us to conclude that remand is appropriate and that review of her other arguments is not necessary.

A.   **The ALJ erred when she did not find migraine headaches to be one of Plaintiff's severe impairments and failed to account for this condition in the RFC finding.**

Plaintiff first contends that the Step Two finding was "erroneous as a matter of law" in that, while she found that Eby-Manescu suffered from (other) severe impairments that satisfied her Step Two burden, the ALJ "dismiss[ed] Plaintiff's migraine headaches as a non-severe impairment[.]" (Pl. Br. at 6.)  Plaintiff contends that the ALJ's conclusions were erroneous as a matter of law as to the durational requirement of severe impairments and that they were also not supported by the record in light of her testimony.  She asserts that the ALJ's dismissal of the migraine impairment at Step Two resulted in an absence of limitations attributable to the migraine condition in the RFC finding, which rendered the ultimate Step Four finding "erroneous as a matter of law and devoid of support by substantial evidence." (*Id.* at 7.)  We agree with Plaintiff that the finding as to migraine headaches was not supported by substantial evidence.

5

The ALJ discussed Plaintiff's migraine condition only in the portion of her decision supporting her Step Two finding. After identifying the medically determinable impairments that she found significantly limited Plaintiff's ability to perform basic work activities, the ALJ then explained why she found three conditions to be non-severe impairments, either because they were not "medically determinable" impairments or they were medically determinable impairments that lacked the requisite functional impact to meet the definition of "severe." As to migraines, she provided the following explanation:

> The claimant's migraine headaches are nonsevere. The claimant alleged headaches 4 to 5 times a week lasting up to 12 hours, however medical evidence of record shows that the claimant responded well to Botox injections (Exhibit 16F). Furthermore, there is little evidence in the record that this impairment cause [sic] more than a minimal impact on basic work activities for 12 continuous months during the alleged period of disability. Therefore, the undersigned finds that they are non-severe.

(R. 19.)

We briefly describe the principles governing review of alleged impairments and then address the argument by Plaintiff that we find compels remand.

### 1. Step Two and "severe" impairments

In order for the analysis to proceed beyond Step Two – that is, to avoid a finding of "not disabled" at that stage – the Regulations require the claimant to "have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement[.]" 20 C.F.R. § 404.1520(a)(4)(ii). As our Court of Appeals has explained:

> The step-two inquiry is a *de minimis* screening device to dispose of groundless claims. [Citations omitted.] An impairment or combination of impairments can be found "not severe" only if the evidence establishes a slight abnormality or a combination of slight abnormalities which have "no more than a minimal effect on an individual's ability to work." SSR 85–28, 1985 SSR LEXIS 19, at

> *6-7. Only those claimants with slight abnormalities that do not significantly limit any "basic work activity" can be denied benefits at step two. *See Bowen v. Yuckert,* 482 U.S. at 158, 107 S. Ct. at 2300 (O'Connor, J., concurring).

*Newell v. Commr of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003). While Step Two functions to weed out claims in which no severe impairment is present, it should not restrict the scope of consideration of the claimant's disability beyond Step Two. The Regulations provide that:

> (c) Combined effect. In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, *we will consider the combined effect of all of your impairments* without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, *we will consider the combined impact of the impairments throughout the disability determination process*.

20 C.F.R. § 404.1523(c). Our Court of Appeals has interpreted this to mean that, "[a]lthough the impairment must be medically determinable, it need not be a 'severe' impairment to be considered in the RFC assessment." *Rutherford v. Barnhart*, 399 F.3d 546, 554 n.7 (3d Cir. 2005).

## 2. The ALJ's evaluation of Plaintiff's response to treatment

Plaintiff faults the ALJ for allegedly concluding that her migraine headache impairment did not meet the durational requirement for a severe impairment. She argues that it was not necessary for her to satisfy the durational requirement for this particular impairment, as she satisfied the durational requirement with other impairments. She also, however, advances the argument that the ALJ's finding is erroneous in that she did *not*, in fact, "respond well to Botox injections," which the ALJ suggested was the basis for her conclusion that this impairment caused no more than "a minimal impact on basic work activities for 12 continuous months" during the asserted period of disability. (R. 19.) Plaintiff contends that the hearing testimony showed that the relief afforded by the injections was temporary. *See* Pl. Br. at 6 (citing to her hearing testimony

7

at R. 44). She also argues that headaches lasting 8-12 hours and occurring 4-5 days per week would inhibit her ability to maintain a normal work schedule for any job. In response, the Commissioner points to portions of the record, specifically R. 1223 and R. 2736, allegedly supporting the proposition that migraines caused no more than a minimal impact on basic work activities for 12 continuous months. (Def. Br. at 4.)

When we review the portions of the record to which the parties direct our attention – Eby-Manescu's testimony at the hearing and the records of the neurology specialist she saw throughout 2019 – we see substantial evidence that this condition impacted Plaintiff for a 12-month period in the manner she described. When asked at the administrative hearing to describe the conditions that interfered with her ability to work, Plaintiff referred to her occipital neuritis pain and her headaches. (R. 41.) The ALJ further questioned her about pain management and inquired specifically about headaches, asking if the Botox shots had been effective. Eby-Manescu responded:

> A    Well I have only had three sessions so far. So far they help a little bit in the midterm of the timeframe in between when they start and when they stop. But then as the time comes closer like the last month and half towards the end, then it's back to the excruciating pain again which makes me nauseous. But it is not every day. It is maybe four to five times a week. It is not a daily you know occurrence.
> Q    And how so – so you are saying on a consistent basis four to five times a week you have a migraine headache?
> A    Yes.
> Q    Every week?
> A    Yes.
> Q    And how long does each one last?
> A    They usually last between eight to twelve hours. I have a tendency to turn the lights off and lay down and have everything be quiet to try and calm some of that response that is going externally. And to calm myself down and to just lay there quietly to try and breathe deeply and control some of that pain.

(R. 44-45.)

The administrative record documents Plaintiff's complaints and details the particular treatment that she underwent in the 12 months leading up to her January 2020 hearing. At her initial visit with neurologist Vitaliy Koss, M.D., on January 10, 2019, to whom she was referred by her primary doctor, Eby-Manescu reported that she experienced more than 20 "headache days" per month. She described to him her experience of the headache, which included nausea and photo- and phono-phobia, and which required her "to go to bed." (R. 2826, ECF 12-50 at 63.) She related that she could limit the duration of a migraine episode to 10 hours by taking medication designed for acute therapy; otherwise, the headache would last 3-4 days. She reported to Dr. Koss that she had tried a number of medications previously, some of which provided some relief or provided relief for a period of time, but which were not consistently adequately effective. (R. 2826-2828, ECF 12-50 at 63-65.) She reported that she had had frequent headaches for years but that they became worse after age 40. (R. 2849, ECF 12-51 at 6.) Dr. Koss concluded that she met the FDA criteria for "chronic migraine," which was defined as headache more than 15 days per month lasting 4 hours a day or longer. (R. 2830, ECF 12-50 at 67.) He instructed her on diet, sleep, and exercise and encouraged her to continue taking her preventive mediations. For acute treatment, he prescribed medications but advised her to "treat headaches 3 days a week or less." He also advised her to "apply for Botox injections" and to consider acupuncture and yoga. (R. 2845, ECF 12-51 at 2.) Plaintiff pursued the opportunity for Botox and underwent her first injection in Dr. Voss's clinic on February 14, 2019. (R. 2802, ECF 12-50 at 39.) At a neurology follow-up appointment with the nurse practitioner on April 10, 2019, Eby-Manescu reported that "she feels that the frequency of her migraines have decreased [since the February Botox treatment] but no change in intensity. She is reporting 3-4 migraines a week, 1 severe migraine a week." (R. 2780, ECF 12-50 at 17.)

9

Dr. Koss saw Plaintiff in a follow-up appointment on May 20, 2019. He documented that she reported that the Botox treatment begun in February "was 70% helpful," in that it decreased her headaches from 4 per week to 3 per week and eliminated the "severe" headache days for the first two months following the injection. (R. 2755, ECF 12-49 at 71.) She was administered another set of Botox injections at that appointment. (R. 2758-59.) She met with the nurse practitioner for follow-up appointment two months later, on July 30, 2019. The NP noted that "she has received her 2nd round of Botox and reports improvement in intensity and frequency. For the past week she has had 2-3 headaches, currently headache free. Prior to botox and ONB[3] she was having 20+ headaches a month." (R. 2736, ECF 12-49 at 52.)[4] At the conclusion of the visit, the provider again noted as to the migraine condition: "Pt starting to get improvement this past week for migraine frequency and intensity; at this time recommend continuing Botox as well as current rescue meds." (R. 2740, ECF 12-49 at 56.) The record reflects that she received Botox injections again in September and December 2019 from a physician assistant, with the plan to continue them every three months thereafter. (R. 2687, 2713.) These notes did not document any report by Eby-

---

[3] This would appear to be a reference to "occipital nerve block" injections. The N.P. noted elsewhere in the progress note as to the occipital neuralgia condition: "Pt had ONB via outsider with good results; recommend continuing with that provider." (R. 2736.) *See id.* (noting bilateral ONB on July 12, 2019 by Dr. Arora and Plaintiff's report of "great improvement with ONB"). This notation is consistent with the report she made at an August 27, 2019 visit with a provider in her primary care practice, Coordinated Health, that she had received an occipital nerve block with Dr. Arora that was "very effective in controlling her [headaches]". (R. 1223, ECF 12-22 at 66.) This report to the PCP practice about the effectiveness of occipital nerve block injections is cited by the Commissioner in her brief as support for the ALJ's Step Two conclusion, *see* Def. Br. at 4, although it was not referenced specifically by the ALJ in her decision.

[4] This page from the record is the other example cited by the Commissioner in support of the proposition that Plaintiff "responded well to Botox injections" and that "there was little evidence" that headaches impacted Plaintiff's basic work activities for a period of 12 months. *See* Def. Br. at 4.

Manescu as to their effectiveness or any changes in her symptoms. She was due to see the Nurse Practitioner again in February 2020, a few weeks after her hearing before the ALJ. (R. 2726.)

The ALJ appears to have reasoned that Plaintiff's headaches were not a problem because she had "responded well" to treatment. (R. 19.) The testimony and the record, however, are in accord that the treatment did not eliminate the headaches but rather only reduced their frequency and intensity for some periods of time. Plaintiff testified at the hearing to frequent episodes of migraine attacks and only limited relief from the Botox injections. She similarly reported to her providers that, by July 2019, the Botox injections had decreased the frequency and duration of her migraines but that the best relief was in the middle of the three-month period between injections. Even after she had begun the course of the Botox injections, she reported that she was still experiencing one "severe" headache per week (April 2019 treatment note) and an uptick in headaches in the final month of the three-month injection cycle (May 2019 treatment note).[5] Given that Eby-Manescu had been experiencing headaches at a rate of 4-5 times per week in several weeks per treatment cycle, and typically for 8-12 hours per episode, even with a reduction in frequency and intensity, she was still impacted by migraines for many hours per week. Moreover, the measures that she described taking to get through a migraine episode would appear to be incompatible with work: turning off the lights and laying down, or "go[ing] to bed" as Dr. Voss described. As the treatment records did not contradict her testimony that migraines continued to impact her in this way, even several months into the Botox course of treatment, it is difficult to see how the ALJ could find that there was only "minimal" impact on basic work activities for any 12-

---

[5] In her January 2020 hearing testimony, Eby-Manescu did not distinguish between "ordinary" and "severe" migraines. She described some relief in the middle of the Botox injection cycle but then afterwards a return to "excruciating pain" accompanied by nausea, and at a frequency of 4-5 times per week, for 8-12 hours at a time. (R. 44-45.)

11

month period during the alleged period of disability. The ALJ's determination that migraines were a "non-severe" impairment cannot be said to be supported by substantial evidence.

This error did not lead to an incorrect outcome at Step Two, as the ALJ recognized that Plaintiff had other impairments that were severe such that Eby-Manescu cleared the Step Two hurdle. The ALJ's failure at the RFC stage to address the limitations arising from the migraine headaches, however, undermines the supportability of the RFC finding. We agree that remand is warranted on this basis. Given this determination, there is no need to address the remaining issues presented in Plaintiff's Request for Review, as they also concern the RFC determination and the Step Four finding, which will be considered anew upon remand.

## V.   CONCLUSION

The ALJ's RFC finding accounted for many of Plaintiff's limitations due to her various impairments. Yet she failed to consider the limitations arising from Plaintiff's migraine headaches due to a reading of the record which cannot be said to be supported by substantial evidence. Accordingly, her RFC determination, and the Step Four finding applying that determination, cannot stand. The ALJ's failure in this regard necessitates a remand.[6] An appropriate order follows.

---

[6] We note that Plaintiff suggested in her opening brief that the Court should remand her case for an award of benefits, although in her reply brief she suggests instead that the Court should reverse and remand for a new hearing and decision. (Pl. Reply at 9.) We are mindful that in *Podedworny v. Harris*, 745 F.2d 210 (3d Cir. 1984), the Third Circuit explored the circumstances under which a court might reverse or modify an administrative decision with or without a remand to the Commissioner for a rehearing. The court there noted that an award of benefits should be ordered "only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-22. In a more recent case, our Court of Appeals noted that an award of benefits pursuant to *Podedworny* "is especially appropriate when the disability determination process has been delayed due to factors beyond the claimant's control." *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 357-58 (3d Cir. 2008). We have never recommended an award of benefits in a case that had only one hearing and where the claim had been initiated only two years earlier. This case simply does not present the extraordinary circumstances that we believe would

---

properly warrant a determination by the Court as to whether the claimant meets the definition of disability.